**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 24, 2026

**BY ECF**

The Honorable Jennifer L. Rochon
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: *United States v. Humberto Beltran Cuen*, 23 Cr. 136 (JLR)**

Dear Judge Rochon:

The Government respectfully submits this letter in advance of the September 29, 2026 sentencing of defendant Humberto Beltran Cuen, following his guilty plea for conspiring to import fentanyl into the United States. For the reasons set forth below, the Government respectfully submits that a sentence below the Guidelines range of 168 to 210 months' imprisonment (the "Stipulated Guidelines Range") calculated and stipulated to by the parties under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines"), would be sufficient but not greater than necessary to achieve the purposes of sentencing.

## I. The Offense Conduct

In or about 2022 and 2023, Humberto Beltran Cuen assisted two large-scale fentanyl traffickers in Mexico, co-defendants and brothers Leobardo Garcia Corrales ("Leobardo") and Martin Garcia Corrales ("Martin"), with importing wholesale quantities of fentanyl into the United States. From August 2022 to February 2023, confidential sources ("CSes") for the DEA communicated with Beltran Cuen and other members of the Garcia Corrales' drug trafficking organization (the "DTO") about purchasing large quantities of drugs. (Presentence Investigation Report ("PSR") ¶ 2). During this period, the DEA seized approximately 33 kilograms of fentanyl imported into the United States by the Garcia Corrales DTO, including fentanyl supplied as payment for an expected fentanyl-for-weapons exchange involving significant quantities of grenade and rocket launchers. (PSR ¶ 11). The DTO also sold additional quantities of methamphetamine to the CSes. (PSR ¶ 30).

In connection with the scheme, a particular CS ("CS-1") met with members of the conspiracy, including Beltran Cuen, multiple times in recorded meetings to discuss CS-1's purchase of fentanyl from the DTO for transportation to the United States, including New York. For example, from August 2022 through February 2023, Beltran Cuen and his co-defendant Martin met with CSes multiple times in Mazatlan, Mexico to discuss shipping fentanyl to the United States and methamphetamine to Australia, and the DTO's purchase of weapons in exchange for sale of the fentanyl. (PSR ¶ 15).

**A. August 2022 Meetings with Martin and Beltran Cuen Regarding Fentanyl Trafficking and Importation**

On August 26 and 27, 2022, two CSes ("CS-2" and "CS-3") had audio and video recorded meetings with Martin and Beltran Cuen at restaurants in Mazatlán. Martin explained that he and his associates were independent traffickers who would do "favors" for the Chapitos and El Mayo. Martin stated that he and his brother Leobardo had a long-standing relationship with El Chapo and that they sheltered El Chapo at their ranch after his first escape from prison. (PSR ¶ 15). When CS-2 said he had a friend in the United States who was interested in purchasing fentanyl, Martin said that he was able to sell fentanyl in "blocks" (*i.e.*, kilograms) for $10,000 each. (PSR ¶ 16).

CS-3 agreed to purchase new cellphones to facilitate future communication with Martin, who told the CSes to refer to him as "Cachuchas." Martin also told CS-3 that the next time he was in Mexico, CS-3 could come to Martin's ranch and meet Leobardo. (PSR ¶ 17).

After the meeting on August 27, 2022, while Beltran Cuen drove CS-3 to the airport, Beltran Cuen explained that Leobardo had been planning to, but ultimately was unable to attend, their meeting. Beltran Cuen stated that Leobardo was the second most important person in Sinaloa. (PSR ¶ 18).

**B. September 2022 Controlled Purchase of One Kilogram of Fentanyl from Martin and Meeting with Martin and Beltran Cuen Regarding Additional Fentanyl Importation and Weapons Trafficking**

On September 2, 2022, following the above-described discussions, Martin sold approximately one kilogram of fentanyl to the CSes through a courier to an undercover law enforcement officer in Perris, California in exchange for $10,000. (PSR ¶ 20).

On September 23, 2022, CS-2 had an audio and video recorded meeting with Martin and Beltran Cuen at a restaurant in El Quelite, Sinaloa. During the meeting, CS-2 observed that Martin was escorted by an armed bodyguard carrying a handgun. CS-2 also saw a nearby vehicle with armed individuals and believed they were additional security personnel for Martin and Beltran Cuen. Martin and CS-2 discussed a joint drug trafficking venture in which CS-2 would operate a fentanyl and methamphetamine laboratory in Guatemala for Martin. (PSR ¶ 22). Martin approved of the idea and explained that he wanted to sell fentanyl to the United States and methamphetamine to South Korea, Europe, and Australia. (PSR ¶ 22).

CS-2 also said that he had the ability to obtain weapons in Europe. In response, Martin explained he wanted to purchase approximately 500 M-4 rifles, .50 caliber rifles, and as many grenades as possible in order to defend himself and his associates. (PSR ¶ 23).

**C. November 2022 Meetings with Martin and Beltran Cuen Regarding Fentanyl Importation and Weapons Trafficking.**

On November 14 and 15, 2022, CS-2 attended additional audio and video recorded meetings with Martin and Beltran Cuen in Mazatlán. During the meeting on November 14, 2022, Martin, Beltran Cuen, and CS-2 continued discussions regarding a shipment of approximately 200

kilograms of methamphetamine to Australia, which Beltran Cuen would deliver to CS-2 at a ranch near the Mexico/Guatemala border. Martin proposed paying approximately $1,000 per kilogram to CS-2 to ensure safe passage to Australia. (PSR ¶ 24). In response, CS-2 proposed that Martin pay a portion of the transportation fee with fentanyl to be delivered in the United States. Martin agreed with this suggestion and discussed locations where the fentanyl could be delivered in the United States. (PSR ¶ 25). Martin also said that he and his brother (*i.e.*, Leobardo) were going to receive a shipment of approximately 1,000 kilograms of cocaine soon in Honduras and asked CS-2 to assist his brother (*i.e.*, Leobardo) with a drug shipment to South Africa. (PSR ¶ 26).

Martin and CS-2 also discussed the weapons deal that CS-2 raised at their September 2022 meeting. Specifically, Martin agreed to send an unknown associate named "Licenciado" to Europe to inspect the weapons. CS-2 and Martin also discussed plans to pay for a portion of the weapons deal with fentanyl to be delivered in the United States. (PSR ¶ 27).

The following day (November 15, 2022), CS-2 attended a follow-up audio and video recorded meeting with Beltran Cuen and another unidentified associate at a restaurant in Mazatlán. CS-2 observed that Martin's bodyguards were present during this meeting but did not appear to be armed. Beltran Cuen explained that Martin was not able to attend because of military checkpoints in the area. Beltran Cuen said that their associate in attendance would travel with CS-2 to Europe to see the weapons that CS-2 had previously discussed with Martin. Additionally, Beltran Cuen confirmed that Martin would provide approximately 10 kilograms of fentanyl in the United States and approximately $100,000 in exchange for CS-2's assistance with the planned transportation of methamphetamine from Guatemala to Australia. (PSR ¶ 29).

Martin later took steps in furtherance of this plan by arranging for the delivery of approximately 77 kilograms of methamphetamine to CS-2 at a ranch near San Vicente Pacaya, Guatemala, which CS-2 had rented at DEA's direction. Specifically, on November 29, 2022, an unidentified courier sent by Martin arrived at CS-2's rented ranch to inspect the property in advance of the methamphetamine delivery. While at the ranch, the courier made a phone call to Martin in CS-2's presence and told CS-2 that the courier would deliver the methamphetamine the following day. The next morning, on November 30, 2022, the courier called CS-2 to confirm the delivery. Several hours later, the courier arrived at CS-2's ranch along with multiple other unknown males (two of whom were carrying handguns) and delivered approximately 77 kilograms of methamphetamine in Tupperware containers. The courier told CS-2 to talk to Martin about payment. The additional fentanyl, which had previously been discussed as payment, was never delivered. (PSR ¶ 30).

### D. December 2022 Weapons Flash Meetings in Vienna, Austria with Soto-Vega

On December 14 and 15, 2022, CS-2 attended audio and video recorded meetings with co-defendant Anastacio Soto-Vega in Vienna, Austria at the DEA's direction so that Soto-Vega could inspect the high-powered weaponry and explosives that Martin and Beltran Cuen had discussed acquiring from CS-2 during prior meetings in September and November 2022. CS-2 attended these meetings with another DEA CS ("CS-4"). Prior to the weapons flash, in recorded communications, Martin represented to CS-2 that Soto-Vega would travel to the meeting on his behalf. Soto-Vega also referred to Martin in his conversations with CSes as "Cachuchas," which Martin had

previously told CS-2 was a preferred alias. Additionally, prior to the weapons flash, Beltran Cuen told CS-2 that Soto-Vega worked for the Garcia Corrales brothers and the Chapitos. (PSR ¶ 32).

On December 14, 2022, two CSes drove Soto-Vega to a warehouse in Vienna, which was surveilled by Austrian law enforcement and outfitted with recording equipment. Once inside, Soto-Vega was introduced to an undercover Austrian law enforcement agent and another DEA CS, who allowed Soto-Vega to handle and inspect multiple weapons and explosives on display. (PSR ¶ 33). An image of Soto-Vega holding a .50 caliber rifle during the meeting is displayed below:



The displayed weaponry included handguns, AK-47 automatic rifles, .50 caliber rifles, explosive devices, and scorpion submachine guns. While handling the weaponry, Soto-Vega discussed his familiarity with the automatic weapons (including the AK-47s). Soto-Vega further explained that he wanted to purchase multiple .50 caliber rifles with optics, AR-15 rifles, M203 grenade launchers, rocket propelled grenades ("RPGs"), Glock handguns, ballistic vests, and ballistic helmets. (PSR ¶ 36).

**E. February 2023 Communications and Fentanyl Deliveries as Payment for Weapons Deal**

Following the weapons flash in Vienna, CS-2 maintained electronic communications with Martin, who arranged through couriers for the delivery of fentanyl in Los Angeles as partial payment for the expected weapons deal. DEA seized approximately 33 kilograms of fentanyl deliveries from Martin in recorded and surveilled courier transactions in Los Angeles. Based on

their electronic communications, Martin has offered to supply as much as 70 kilograms of fentanyl as part of the weapons deal. PSR ¶ 40.

Additionally, during the week of February 10, 2023, Beltran Cuen attended a series of meetings with CS-2 in Guatemala on behalf of the DTO. Most of these discussions were audio and video recorded. (PSR ¶ 41). During these meetings, Beltran Cuen told CS-2 that Leobardo, Martin, and their younger brother "Charlie" were all involved in drug trafficking. He also noted that Leobardo was very powerful and a close associate of El Chapo. Beltran Cuen explained that Martin and Leobardo own and operate multiple methamphetamine laboratories and transport drugs to Costa Rica, Panama, and the United States. Beltran Cuen described that Martin focuses on the production and distribution of methamphetamine and marijuana, while Leobardo focuses on drugs being transported from Central America to Mexico and into the United States. (PSR ¶ 42).

CS-2 told Beltran Cuen that CS-2 was in contact with Martin regarding the kilogram quantities of fentanyl being delivered in Los Angeles for the weapons deal, but that at one point Martin was not answering CS-2's communications. (PSR ¶ 43). Beltran Cuen said that the fentanyl being delivered in Los Angeles was part of a load belonging to Leobardo. Beltran Cuen also noted that Martin had sent a load of cocaine to the United States and that Martin had exchanged a cocaine load for fentanyl, which Leobardo had sent to the United States. Beltran Cuen said that Martin wanted the various firearms and explosives in the weapons deal to protect themselves from the Mexican government and other DTOs. (PSR ¶¶ 42-43).

## II. Procedural History and Guidelines Calculations

On April 14, 2023, an indictment was unsealed charging the defendant and his co-defendants Leobardo, Martin and Soto Vega with from at least in or about August 2022, up to and including the date of the filing of the indictment, (1) participating in a conspiracy to import 400 grams and more of fentanyl into the United States, (2) possession of machineguns and destructive devices in furtherance of Count One, and (3) conspiracy to possess machineguns and destructive devices.

On March 18, 2023, the defendant was arrested in Guatemala. (PSR ¶ 45). On June 30, 2026, pursuant to a plea agreement with the Government (the "Plea Agreement"), the defendant pled guilty before this Court to a lesser included offense of Count One, participating in a conspiracy to import at least 40 grams of fentanyl. (PSR ¶ 1). The lesser-included fentanyl importation offense carries a five-year mandatory minimum term of imprisonment.

In the Plea Agreement, the parties stipulated to a total offense level of 35, with a Stipulated Guidelines Range of 168 to 210 months' imprisonment, which matches Probation's calculations. (PSR ¶ 101).

Under U.S.S.G. § 2D1.1, the base offense level is 36 because the defendant conspired to import at least 12 kilograms but less than 36 kilograms of fentanyl pursuant to §2D1.1(a)(5) and (c)(3). (PSR ¶ 53). Under U.S.S.G. § 2D1.1(b)(1), a two-level increase is warranted because a dangerous weapon was possessed. (PSR ¶ 54). The defendant has demonstrated acceptance of responsibility for the offense and thus the offense level is decreased by two levels, pursuant to U.S.S.G. § 3E1.1(a); and because the defendant timely notified authorities of his intention to enter

a plea of guilty the offense level is decreased by one additional level, pursuant to U.S.S.G. § 3E1.1(b). (PSR ¶¶ 60-61).

Probation recommends a below-Guidelines sentence of 132 months' imprisonment, followed by four years of supervised release. (PSR at 29).

## III. Relative Culpability

The defendant is less culpable than the Garcia Corrales brothers who led the DTO, but more culpable than Soto Vega because, as described above, the defendant was directly involved in coordinating the fentanyl transactions with the CSes. He is the first of the four charged defendants to be sentenced in this case.

## IV. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

### B. A Substantial Sentence Below the Stipulated Guidelines Range Is Warranted

A substantial sentence below the Guidelines would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

The seriousness of the defendant's conduct warrants a substantial term of imprisonment. The defendant played an important role in the DTO's fentanyl enterprise by working to import approximately 33 kilograms of fentanyl into the United States from Mexico, and his discussions with the CSes make clear that he was willing and able to sell even more. In addition, recordings

show that Beltran Cuen and his co-defendants were willing to facilitate sales of dangerous weapons, ranging from AR-15s to rocket-propelled grenades. The defendant also assisted the Garcia Corrales brothers, who are high-level traffickers, despite his knowledge of their production and distribution of other dangerous drugs like methamphetamine.

As the Court is aware, fentanyl is a particularly dangerous substance, and even small amounts can be fatal. Indeed, according to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[1] The crisis has only worsened. According to the CDC, in 2023—when the defendant was trafficking fentanyl—for the first time in U.S. history, the overdose death rate topped 112,000 in a 12 month period, with young people and people of color among the hardest hit.[2] The magnitude of this calamity now appears to have eclipsed every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[3] The cost to ordinary families destroyed by the fentanyl crisis is incalculable. The defendant contributed to that crisis for his personal gain.

Although the defendant was not as culpable as the masterminds of the scheme—the Garcia Corrales brothers—he cannot be described as a low-level trafficker or compared to those who merely moved or even sold drugs. The defendant was responsible for moving, in wholesale quantities, a dangerous drug that has harmed thousands of victims. Individuals who are tempted to assist dangerous DTOs in any way should know that they will be held accountable for their actions.

In addition, the defendant's personal history and circumstances weigh in favor of a robust sentence. The defendant was convicted in 1986 for a heroin offense and sentenced to 240 months. Notwithstanding this very significant sentence, the defendant was not deterred and returned to a life of drug trafficking. Although the sentence did not result in criminal history points because of its age, it is relevant to assessing the appropriate sentence in this case.

[redacted]

---

[1] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text=Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022; *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at *1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal. In 2020, the National Institutes of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year. Fentanyl can wreak[] havoc on entire communities . . . [and] destroy[] lives.").

[2] Brian Mann & Aneri Pattani, In 2023 Fentanyl Overdoses Ravaged the U.S. and Fueled a New Culture War Fight, Nat'l Pub. Radio, Dec. 28, 2023, https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction (last visited December 9, 2025).

[3] *Id.*

[redacted]

**V. Conclusion**

For the reasons set forth above, a sentence under the Stipulated Guidelines Range would be sufficient but not greater than necessary in this case to meet the goals of sentencing under Section 3553(a).[4]

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: /s/
Jane Chong/ Sarah Kushner/ David Robles
Assistant United States Attorneys
(212) 637-2263/-2676/-2250

cc: Lorraine Gauli-Rufo, Esq.

[4] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).